TUCKER, P.
Some of the points which have been argued at the bar do not fall within the view that I have deemed proper to take of the rights of the parties: I have therefore not intimated any opinion upon them. A short statement will best present the point on which I consider these cases as turning.
In 1809, John Lee conveyed the lots in question to Alexander Caldwell, to secure certain debts. In 1811 he conveyed the same lots to Noah Linsley, another trustee, to secure other debts. Lee died in 1814, and Linsley *in the same year. Linsley by his will devised these lots to his executors Sprigg and Zane, with power to execute the trust. This authority I take to be, beyond question, void. In 1818, the persons entitled to the equity of redemption in this property were A. Caldwell for one half, mrs. Chapline for one fourth, and mrs. Hughes for one fourth. In that year, the creditors having applied to Sprigg to proceed with the sale, he and his coexecutor did so. The lots were bought by Steenrod at 2470 dollars; a full price, as is clearly proved. The sale was assented to by A. Caldwell, representing one half, and Josiah Chapline the husband of Sally Ann, who represented one fourth. Mrs. Hughes, representing the remaining fourth, was covert and out of the state. After the sale, and payment of the debts, A. Caldwell received one half of the balance, and Josiah Chapline received the other half, on account of his wife and mrs. Hughes.
On this simple state of facts certain questions arise, the answers to which must decide the cause. Had the executors the title to the property in them by the devise? Unquestionably: whether they had the power and authority of trustees or not, the title clearly passed to them by the will. Had the creditors a right in any way to enforce a sale? Without doubt: they might have filed a bill of foreclosure; and that was the regular mode in which they should have proceeded. The sale by the executors was certainly irregular and unauthorized by the deed. But though unauthorized and irregular, will the court, even upon the application of infants and femes covert who have been guilty of no default, set it aside under the circumstances of this case? I think not. The creditors had a right to enforce the trust. Under a false impression of the law, they apply to the trustee’s executors to sell. The person representing one half the equity of redemption assents to the sale, under the like impression ; and the tenant by curtesy of another fourth does the same. The trustees proceed; 'x'the sale is fairly made; a full price is obtained; the purchaser pays up his money ; It is scattered by distribution among the creditors, and the owners of the equity of redemption; and the sale is in effect ratified by the representative of one half, by the receipt of his portion of the surplus, and by the husband of the representative of another fourth, by the receipt of her portion. Since these transactions, sixteen years roll by without objection: another person (James Caldwell) purchases of the bidder at the sale, pays up his money, and builds largely on the property, which has been thus greatly increased in value, not only by the natural rise in a growing city, but by actual and expensive improvements. Will a court of equity unravel all that has been done, and decree a new sale, merely because of the irregularity; an irregularity, too, of which the best counsel of the day seem in no wise to have been aware? This is the true question to be decided.
That a court of equity would not be disposed to realize the dreams of profit which probably gave rise to this suit, seems clear from the course it has pursued in yet stronger cases. The complainants can upon no principle be entitled to recover the valuable improvements which have been made upon the property by the purchasers, in the confidence of title, and before any intimation of claim on the part of Lee’s representatives. In Southall v. M’Keand & others, 1 Wash. 336, the claim of Southall was made known to M’Keand, but he instituted no suit to enforce it, till M’Keand had placed improvements to ten times the value on the lot. The court decided he should only have the value at the time M’Keand purchased, which was directed to be ascertained by a jury. They said, it was unreasonable he should in equity avail himself of the increased value produced by his own delay, since M’Keand had a right to suppose, from that circumstance, that he had deserted his claim. So in our case. A sale was made, of the ^validity of which no one doubted. There was no mala lides in the trustees, the purchaser, or the vendee of the purchaser. All parties sui juris had acquiesced in the transaction. The defendant Caldwell held the property for eight years before he began his improvements. No pretence of title was set up. He then proceeded to build, while the parties sui juris silently looked on. It would indeed be unreasonable that they should now avail themselves of the increased value produced by their own conduct, since Caldwell had a right to suppose that they had no claim to the property, or that they had abandoned it. And here let it be observed, that the time from which abandonment is presumed is not governed by the rules which prevail *650 as to aa equity of redemption. Twenty years are not necessary to justify the presumption of abandonment. It depends upon the acts of the parties, and the circumstances of the case; and it might in this case well have been presumed by Caldwell, from the acquiescence of all the parties interested who were sui juris, and of the natural protector of the only party who was not. See the remark of judge Cabell in Cresap v. M’Lean & al., 5 Leigh 391, and the cases there cited by him.
The case of Pierce’s adm’r &c. v. Trigg’s heirs,* decided at the last term, affords another instance of a similar description. In that case an irregular sale had been made, and the parties interested were infants at the time of the sale. They sought a resale. The court refused it; but as there was no proof that the price was a full price, it directed a valuation to be made of what the property was worth at the time of the sale, and the excess, if any, over the price for which it had sold, to be paid to the claimants.
Pursuing the principle of these cases, then, it is very clear that the plaintiffs can have no benefit of the improvements made by Caldwell. Their only pretence of claim is to the value of the lots.
*In considering this pretension, let' us recur again to the fact that the creditors had a right to have the sale made in 1818; that all the parties, then sui juris, approved it; that a general mistake prevailed among all concerned, as to the powers of the executors to sell; that every thing was fairly conducted, and that the trust property commanded a full and fair price. Ought a court of equity now to set aside the sale, and direct a resale, or ought it even to direct an enquiry as to the value of the property in 1818, in the expectation that upon such valuation the plaintiffs might get something more? I think not. When that has been done, which ought to have been done, though not precisely in the manner it ought to have- been done, equity should not interfere. The claimants themselves have no equity, and never had any. They have sustained no injury, and without that they can have no equity. Had a bill of foreclosure been filed, a court of chancery would have decreed a sale in 1818. It would have appointed a commissioner, or the executors themselves, to sell; and most probably the latter, as they were liable to no exception, and the title was in them. If so, precisely that has been done, which the court would have ordered to be done; and therefore it must be taken to have been well done. Por what a trustee (and such the executors were) is compel-lable to do by suit, he may do without suit. 2 Ponb. Eq. 175. There is then no motive for the action of a court of equity. On the other hand, there is the strongest motive for its not acting; for it cannot bring back the year 1818. Its only proper power would be to do now what should have been done then. But that it cannot do, because it cannot carry itself back to the date at which the creditors had a right to have a sale. If indeed the property had been sacrificed, measures might be taken, as in Pierce’s adm’r &c. v. Trigg’s heirs, and in White v. Atkinson, 2 Wash. 94, to ascertain the proper redress. But the proof is ample that the sale *was fair and the price full, and indeed there is no allegation to the contrary.
It remains but to refer to the case of Taliaferro v. Minor, 1 Call 524, to show, that though a sale by trustees has not been made in strict pursuance of a power, and though the parties complaining were infants when it. took place, a court of equity will not set it aside, if every thing was fair, notwithstanding á loss has accrued to the infant parties interested in the transaction. It may be regarded, I think, as sustaining the position, that if a sale be made by trustees when it ought to have been made, and if it be fairly made and for a full price, a court of equity will not interfere with it, even at the instance of infants, though the trustees may not’ strictly have pursued their authority. This appears to me sound doctrine, and decisive of these cases.
The result is, to affirm the decree in Hughes v. Caldwell, and reverse it and dismiss the bill in Caldwell v. Chapline’s heirs.
The other judges concurred. In Hughes v. Caldwell, decree affirmed: in Caldwell v. Chapline’s heirs, decree reversed and bill dismissed.

Reported 10 Leigh 406. — Note in Original Edition.